James M. Piotrowski
Marty Durand
HERZFELD & PIOTROWSKI, LLP
824 W. Franklin
P.O. Box 2864
Boise, Idaho 83701
Telephone: (208)331-9200

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| M.D. as guardian of D.D., S.B. as guardian of J.H., M.O. as guardian of J.O., and Z.Y., Plaintiffs,<br><br>Plaintiffs,<br><br>v.<br><br>RICHARD ARMSTRONG, in his official capacity, and DENISE CHUCKOVICH, in her official capacity.<br><br>Defendants. | Case No. 1:16-cv-23<br><br>**COMPLAINT** |

Plaintiffs, by and through their attorney of record, hereby complain and allege as follows against the above named Defendants:

## I. NATURE OF THE CASE

1. On December 18, 2015, the Defendants Armstrong and Chuckovich (through their agents) announced reimbursement rate cuts of up to 46% for certain services provided to Medicaid participants receiving services under Idaho's Home and Community Based Services Waiver for individuals with developmental disabilities. Plaintiffs are participants who will be subjected to Medicaid service reductions as a result of such

reductions, but who have not received notice of the reductions, have not been provided an opportunity to appeal the decision to reduce services, have been denied their choice of service providers, and face imminent institutionalization as a result of Defendants' conduct, all in violation of their rights to due process of law, pursuant to the Medicaid act, and under the Americans with Disabilities Act.

## II. PARTIES

2. Plaintiffs are individuals with developmental disabilities who reside in the State of Idaho. Each of them participates in Idaho's Medicaid program, resides in their own home (either rented or owned) and receives Residential Habilitation (ResHab) services. Plaintiffs bring suit on behalf of a proposed class of similarly situated Idaho residents.

3. Plaintiff S.D. is an adult living in Boise, Idaho. M.D. is S.D.'s legal guardian, and is also S.D.'s primary caregiver. S.D. suffers from moderate cognitive impairment, mood disorder, seizure disorder and Lennox Gastuat type epilepsy. M.D. receives high level ResHab services in his own home, where he is able to receive 24-hour per day, one-on-one care solely because his parents serve as his direct care providers.

4. Plaintiff J.H. is an adult female living alone in Southwest Idaho, S.B. is her court appointed guardian. J.H. has suffered bipolar disorder, mild cognitive impairment, anxiety disorder, seizure disorder, type II diabetes, and a number of other medical conditions. J.H. relies on the use of supplemental oxygen and a C-Pap machine to maintain blood oxygen levels, but frequently fails or refuses to comply with doctors' orders in these regards and others. In the past, J.H. has had multiple altercations with her roommates, some of which escalated to the point of requiring police intervention, and at least one of which resulted in a misdemeanor charge leading to community service. J.H.

receives intense level care which is necessary to ensure that she complies with physician's orders, utilizes her medical equipment appropriately, and to assist with mobility and safety.

5. Plaintiff Z.Y. is an adult resident of Idaho who lives with autism, attention deficit/hyperactivity disorder, and type I diabetes. Z.Y. previously attempted to live on his own but was unsuccessful. When he is alone he forgets to check his blood sugar or to take regular doses of insulin as required to treat his diabetes, and also fails to monitor his own diet, another aspect of his diabetes treatment. Z.Y. would also fail to maintain a livable environment and does not clean his own home without prompting. He is currently authorized for intense level ResHab services, but is slowly reducing his daily hours of needed care.

6. Plaintiff J.O. is an adult resident of Idaho who lives with Asperger Syndrome, Reactive Attachment Disorder, and ADHD. He also exhibits traits of bi-polar disorder. M.O. is the court-appointed guardian of J.O. J.O. has previously received high level ResHab services in supported living, generally in apartments with other Medicaid participants. During those placements he has assaulted his roommates with a knife and other sharp objects, attempted to kick a police officer, and was arrested on at least two occasions. When incarcerated, J.O. has attempted to harm himself. When not incarcerated he tends to leave his home unaccompanied, during which times he engages in anti-social behavior. J.O. currently receives Intense level ResHab services and receives 24-hours per day of one-on-one staffing.

7. Richard Armstrong is the current acting director of the Idaho Department of Health and Welfare, and resides in the State of Idaho. Denise Chuckovich is the

Department's Deputy Director for the Medicaid program and resides in the State of Idaho.

## III. JURISDICTION AND VENUE

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 42 U.S.C. §1983 and supplemental jurisdiction over claims arising under state law, if any, pursuant to 28 U.S.C. §1367. Venue is appropriate in this District as the Defendants reside herein, the Plaintiffs reside herein, and the facts and events giving rise to the claim occurred herein.

## IV. GENERAL FACTUAL ALLEGATIONS

9. Medicaid is a joint state-federal program in which states agree to abide by certain conditions in the operation of a medical care program for the poor, in exchange for which agreement, the federal program provides approximately 70% or more of the funds necessary to operate the program. The waiver program is a program within Medicaid that allows the state to receive federal funding for certain home and community based services including Residential Habilitation ("ResHab"). The State of Idaho operates a Home and Community Based Services Waiver for developmentally disabled Medicaid participants known as the "DD Waiver." To qualify for services under the DD Waiver, participants must qualify for Medicaid and must also suffer developmental disabilities sufficiently severe that they would otherwise qualify for Medicaid reimbursement of institutional levels of care. Plaintiffs who receive DD waiver services would otherwise be eligible for placement in state hospitals, Intermediate Care Facilities, or nursing homes. In fact, it is for this specific purpose that the Medicaid waiver program was created, so that such individuals could reside in the community rather than being

"warehoused" in institutions.

10. In order to qualify for waiver services, Plaintiffs must meet the criteria for placement in an Intermediate Care Facility for the Intellectually Disabled (ICF/ID). Those criteria are only met if an individual has a functional mental age of 8 years or less as measured by a particular assessment instrument, or meets at least one of several closely related criteria set forth in IDAPA 16.03.10.584(05), as well as meeting multiple other criteria.

11. Plaintiffs also receive a service known as Residential Habilitation ("ResHab") and meet criteria for "Intense support" level of ResHab services. To qualify for "Intense support," Idaho Department of Health and Welfare requires proof that the individuals, in addition to meeting all other criteria, have recent felony convictions or charges related to doing serious harm to another, have a history of predatory sexual offenses and a high risk of reoffending, a sustained history of serious, aggressive behavior, or medical conditions which are so unstable or complex as to require one-to-one staffing levels to avoid institutionalization.

12. Participants choose their service provider from among approximately 60 ResHab agencies in Idaho, each of whom must execute a Provider Agreement, in which they agree that they will not demand or accept any payment other than that provided by Medicaid, for their covered services to Medicaid participants. ResHab Agencies are barred, by the provider agreements, as well as by applicable state and federal law, from charging their Medicaid participant clients, any amount over and above what the state pays them.

13. At 3:54 p.m. on Friday, December 18, 2015, the Idaho Department of Health and

Welfare ("IDHW"), issued an information release notifying ResHab providers of an enormous reduction in the reimbursement rate for ResHab services, to be effective on January 1, 2016; only thirteen (13) days from the issuance of the release. The new reimbursement rates enacted by IDHW affect all levels of services, but for "intense" support participants, the daily reimbursement rate was cut from $496.56 per day, to a mere $268.36 per day; for "high" level support participants from $248.40 to $225.32 per day; and for hourly support participants from $5.15 per 15 minute unit ($20.68 per hour) to $3.24 per 15 minutes ($12.96 per hour). In addition, IDHW reduced the daily maximum of billable hourly services (which combines ResHab with several other services) from $240.03 to $193.61.

14. On Tuesday, December 22, 2015, at approximately 5:00 p.m., IDHW issued a second Information Release, which stated that it would delay implementation of its rate reduction for thirty-one days, to February 1, 2016. On information and belief, this delay in implementation was the result of hundreds of calls from providers and participants complaining about the effects of the proposed rate reduction, pressure from Idaho legislators, negative news coverage of the reduction, and the realization that cutting off critical habilitation services at midnight on New Year's Eve would not be in the best interests of participants or the State of Idaho. The December 22 Information Release implicitly recognizes that the change in reimbursement rates will result in significant changes in services for affected participants.

15. Participants will feel the effects of the new rates immediately. The current reimbursement rate is $498.00 per day for the "intense" support participants, and IDHW proposes to reduce those rates to $268.36 per day. Most of those participants require

twenty-four hour per day services, with most or all of those hours at 1:1 provider/patient ratio, so IDHW new rates only allow $11.18 per hour of care. Few, if any, providers will be willing to provide services at a rate which does not allow them to recover the cost of the service.

16. The reduced reimbursement rates will result in a reduction of services to participants, including Plaintiffs. ResHab Agencies cannot provide, and Plaintiffs cannot receive, the same services under the new rates that they received under the old. While the rate reductions will most severely affect Intense support participants, effects will be felt by all Medicaid participants who receive ResHab services in supported living environments. Intense level participants are unlikely to receive the 24-hour one-to-one services many of them receive currently, for the simple reason that the proposed rate reductions make it financially infeasible to provide such service. At $268.36 per day, the new rates provide only $11.18 per hour. Since direct care providers currently and typically earn between $9 and $12 per hour for serving intense level clients, the proposed reimbursement rates leave from little to nothing to cover employment related expenses, benefits, administrative expenses, overhead, supervision, or training.

17. Since the rate reductions were announced, ResHab providers have already begun informing Intense level participants that they will no longer be provided services, that they will have to find roommates in order to continue to receive services (with a roommate participants can "share" care providers, effectively reducing the hours of one-to-one services they receive), or that they will have to make do with High level supports instead of Intense level precisely because of Intense level's reliance on one-to-one care ratios.

18. Even some High level service recipients have been informed that they will either cease to receive services or will have to move in with roommates in order to continue to receive services. Likewise, hourly service recipients face similar challenges, and ResHab providers have reported that they will curtail or cease providing hourly ResHab services.

19. In a December 23, 2015 letter to participants receiving ResHab services, IDHW Bureau Chief Art Evans claimed that the reimbursement rate reductions would not result in service reductions, and that despite cutting reimbursement rates to between $9.39 and $11.18 per hour, "the new rate still pays for 24 hours of care" for Intense and High level participants. In fact, there is no way that participants, including Plaintiffs, will continue to receive the same level of care they have received in the past.

20. The reimbursement rate reductions will necessarily result in participants receiving fewer hours of one-to-one care, care from lower paid workers, or care from staff that are divided among multiple participants.

21. To date, Defendants Armstrong and Chuckovich have failed to provide notice to participants, including Plaintiffs, of the reduction in services resulting from the new reimbursement rates. Instead, Defendants have merely assumed that private sector service providers will do the same work for $268 per day, that they have been doing for $496 per day. That assumption is unjustified, unrealistic and incorrect.

22. Plaintiffs have a property interest in continued receipt of Medicaid services.

23. Because Defendants have chosen to pretend that services will not be reduced, they have not provided Plaintiffs with notice of the service reductions that are an inevitable result of cutting reimbursement rates, and have not notified Plaintiffs of their right to appeal, and have not provided an avenue to appeal, all in violation of the right to due

process of law and Title XIX of the Social Security Act and its implementing regulations.

## V. CLASS ACTION ALLEGATIONS

24. Plaintiffs bring this case on behalf of themselves as well as on behalf of a proposed class consisting of all Idaho Medicaid participants currently receiving Residential Habilitation Services in a Supported Living Environment.

25. Plaintiffs believe that the proposed class consists of at least hundreds, and likely thousands of individuals. Such a group is too numerous for joinder of all members to be practicable.

26. This case presents common questions of law and fact including whether the reimbursement rate cuts will cause service reductions, whether such service reductions will impact quality of quantity of care, whether proper notice was provided, whether an opportunity to appeal the decision was provided, whether such notice and opportunity was required as a matter of law, whether rate cuts will lead directly or indirectly to institutionalization of some members of the class, and whether requiring maintenance of existing rates constitutes a fundamental change in Idaho's Medicaid program.

27. The named Plaintiffs are typical of the members of the proposed class in that their claims arise from the same facts and course of conduct by Defendants, and thus are typical of the claims of the putative class.

28. The named Plaintiffs have no conflicts of interest with other members of the class, have retained counsel adequate to bring this action, and because of their shared interests will fairly and adequately protect the interests of the class.

29. Prosecution of numerous, separate claims would create a risk of creating inconsistent and incompatible standards of conduct for the Defendants which could force

them to violate federal law.

30. The Defendants' conduct in this matter has applied generally and equally to all members of the putative class. The final injunctive relief sought in this case is appropriate for the class as a whole.

**COUNT I**
**Denial of Due Process of Law**
**42 U.S.C. §1983; 42 U.S.C. §1396a(a)(3)**

31. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

32. Because Plaintiffs and the putative class have a property interest in continued receipt of Medicaid benefits, they are entitled to notice and an opportunity to be heard prior to cessation or reduction of those benefits, pursuant to the XIVth Amendment to the United States Constitution.

33. In addition to their Constitutional rights to due process of law, Plaintiffs and the putative class have a right based in federal statutes and regulations to notice and an opportunity to be heard prior to reductions in their benefits pursuant to 42 U.S.C. §1396a(a)(3).

34. Defendants were obligated to but have not provided notice and an opportunity to be heard, despite that, while acting under color of state law, they are reducing the benefits and services that Plaintiffs and the putative class will receive on and after February 1, 2016.

35. Plaintiffs and the members of the putative class are entitled to preliminary and permanent injunctive relief barring the Defendants from reducing services or benefits without providing affected Medicaid participants with advance notice and informing them of their rights to appeal.

**COUNT II**
**VIOLATION OF THE AMERICANS WITH DISABILTIES ACT;**
**42 USC §12132**

36. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

37. Plaintiffs and the members of the putative class, by definition, qualify for institutional care in Idaho's Medicaid program. Medicaid participants may only qualify to receive ResHab services if they face institutionalization "in the near future" in the absence of intensive community supports.

38. By precipitously reducing ResHab service rates, causing the termination of services for some, and the necessary reduction of services for most or all ResHab recipients, the Defendants will force some participants into institutional care. This will occur either because participants and their guardians will seek institutional care in the absence of available community supports, or because participants will be involuntarily placed into hospitals or jails as a direct and proximate result of the reduction or loss of community services.

32. By operating the state Medicaid program in a way that it forces some members of the putative class into institutions, Defendants are violating the integration mandate of the ADA as set out in implementing regulations.

33. Plaintiffs and the members of the putative class are entitled to preliminary and permanent injunctive relief barring the Defendants from implementing the reimbursement rate reduction in a manner that would result in institutionalization of developmentally disabled individuals who are capable, with appropriate services, of residing in their communities.

WHEREFORE, Plaintiff respectfully requests for a judgment against Defendants, jointly and severally, as follows:

1. For a preliminary injunction pursuant to F.R.C.P. 65(a), to enjoin the enactment of the service reduction until such time as IDHW complies with the due process requirement of the Fifth and Fourteenth Amendments to the United States Constitution;

2. For a preliminary injunction pursuant to F.R.C.P. 65(a), to enjoin the enactment of the service reduction to the extent that it would cause or result in violation of the Americans with Disabilities Act;

3. For permanent injunctive relief consistent with and to the extent necessary to prevent violations of the constitutional and statutory rights of Plaintiffs and the proposed class;

4. For Plaintiff's reasonable attorney fees incurred in prosecuting this action;

5. For costs of suit herein;

6. For such other and further relief as the Court deems just and equitable.

RESPECTFULLY SUBMITTED this 14th day of January, 2016.

HERZFELD & PIOTROWSKI, LLP

/s/

James M. Piotrowski
Attorney for Plaintiffs